Thank you, your Honor. For the record, my name is Jack Sands. I represent Victoria Nava. At other times and in other places, the sins of the fathers were vested upon their children, and it appears that inadvertently that is what occurred in this case. Victoria Nava's father was Victor Nava was convicted in a federal drug case and sentenced to two life terms in prison. As a part of his sentence, the jury considered three pieces of property in order that they be forfeited. Two of those pieces of property were owned by Victoria Nava. Victoria Nava was never charged in the case, was never a criminal defendant. Mr. Sands, what was the jury's, what standard did the jury have to find in that case? Was it simply preponderance of the evidence that he, that Mr. Nava owned the property? I assume that they had to find that beyond a reasonable doubt, your Honor. We have a title report in this case. There is no evidence, no support whatsoever, that Victor Nava ever had title to either of the two properties in question. Help me out here a bit, because the real problem I see is that the district court as it's supposed to do had an ancillary evidentiary hearing. Yes. Well, unless legal title is in and of itself enough to have Victoria prevail, then the district judge made credibility findings, which are amply supported in the record, that he disbelieved her and Frank, and therefore. So how do you respond to that? I respond, your Honor, that the interest, whether or not Victoria has an interest in property is determined under the law of the State of Montana. Whether or not it be forfeited is a Federal question, of course, a question of Federal law. So your question is she had legal title. Yes. So the question is, is that enough, because that's really what it comes down to. Yes, your Honor. That is the way interest in property are determined in the State of Montana and in every other State, as far as I am aware. Well, I have a forfeiture proceeding. Pardon? Well, I have a forfeiture proceeding, because the whole point of the forfeiture proceeding is to see who's got a superior interest in the property, such that the drug dealer cannot convey legal title to property simply in order to avoid forfeiture. In this case, he never had legal title. Never, ever had legal title. Never had legal title to convey that the 1102 property was owned from 1963 until 1991 by Victoria Nava's grandmother. She had legal title. She had legal title. And she had indicated shortly before she died that she wanted Victoria to have the property when she reached 18 years of age. Well, we don't – that depends upon a credibility finding, which goes adversely to your client. I understand. But that's the way that the title report shows, that legal title was transferred from the grandmother to the cousin. Then when Victoria reached 18 years of age, title went to her. And on the same day, the cousin suddenly got marital problems and conveyed his own property to her also. That's correct. At the time that she reached 18 years of age. This would have been – this was 1996? Yes, Your Honor. Before this indictment ever came down. This property was owned in a chain of title by Victoria's grandmother and then her cousin before these indictments ever came down. There was never any indication in any record whatsoever that Victoria Nava had any interest in these properties at any time. Or that the properties were ever acquired as a result of proceeds from drug transactions. He admitted it. That's enough. Pardon? He admitted it in his plea agreement. These were his properties acquired by drug proceeds. Now, I understand from the withdrawn plea agreement that Mr. Nava had indicated that the properties were held in other people's names and that he would try to get them to convey the property to the government. That plea agreement was withdrawn. That was a sealed plea agreement. That was something that Victoria Nava had never been a party to, had never seen until the day of the ancillary hearing. Obviously, never had any opportunity to cross-examine any witness or anybody about that. And to keep her from putting on her father or anybody else she wanted to, including the people who testified that they lived in the house and paid rent to her father. Right? Well, her father was in a Federal prison in Arizona at the time of the ancillary hearing. But obviously, since the plea agreement was unsealed just at the hearing, I mean, she really had no notice that some kind of unsealed plea agreement would be introduced in evidence against her when she. Can I ask you just to come back to where I started my question, please? Yes. Do you have authority for the proposition that in a criminal forfeiture situation, the single dispositive fact is holding legal title? The cases that I've cited in my brief indicating Lester and Hooper indicate that the question of whether or not Victoria Nava has an interest in the property that is to be determined by state law. And the state law says that title to property is transferred by deed. I know of no law, no procedure under the laws of the State of Montana in which somebody can obtain title or interest in property by making a payment of taxes on a couple of circumstances. There is no dispute for purposes of my question and my concern about whether she had legal title. She did have legal title to both pieces of property which she acquired on April 11, 1999, on the same day from her cousin. Right. Okay? She had legal title. My question is a matter of Federal forfeiture law. Yes. Do you have any authority that says that the single dispositive fact is holding legal title? None except what I have expressed previously. Okay. Counsel, why don't you reserve your time for rebuttal? We'll hear from the governor. Ms. Hurd, I take it you are replacing Mr. Sikora? I am, Your Honor. Mr. Sikora is in trial and I filed a notice of substitution of counsel. Very good. Thank you. And I'm glad that I did because this is a fun case. That's the part about doing somebody else's case that you can dig through and look at the facts and see what you think is interesting. And actually, the forfeiture was found by preponderance of the evidence. If you look at the excerpts of record, page 186 would be the supplemental excerpts filed by Mr. Sikora. The instruction clearly said that the United States must prove its case for forfeiture by a preponderance of the evidence. And then the jury went out. Twenty minutes later, they came back in with a note. And the note said, are we limited to considering only this property? In other words, could we also consider a van and other property we'd like to forfeit? And the defendant's lawyer said, well, they can have his shirt. And the court said, I'd say you're in trouble. And Mr. Sikora said, they're not joking, are they? So there was a preponderance of the evidence standard that was found for the forfeiture. That's the first issue. Because she didn't have an opportunity to contest any of that because she wasn't part of the criminal proceeding. Exactly. And she couldn't be. And exactly what the court did is exactly what they're supposed to do. Okay? You couldn't as a matter of that. So now you come in in the ancillary proceeding and you put on everybody to say. You get to show that you're either a bona fide purchaser. Exactly. Or that you're the owner of the property, that you have a superior title. Exactly. And since Mr. Nava did not have any title at all, and she did have title on Montana law, why hasn't she satisfied the burden of showing that she has a superior title? Because, quite frankly, the judge didn't believe her. Wait a minute. Didn't believe her what? That she had title? Exactly. Didn't believe that she was the lawful owner. Not that she had title. Because she did. Although, if you look at the record. Does Montana have any provision for saying that somebody who doesn't have title is not the lawful owner? Do we have a sham proceeding? Do you have a sham doctrine? Yes, I believe that we do. I mean, Mr. Sams could give me the deed to his house, and I have title to his house. But it doesn't mean that I'm the lawful owner of that house. Whoa, whoa, whoa. Why wouldn't it? Because in a federal forfeiture proceeding, that is the point of this ancillary proceeding. I could give, if I'm a drug dealer, I could give you my house. And you could come in and say, no, no, no, it's my house. But at least you would have been in the chain of title. And Mr. Nava has never been in the chain of title, and that has collateral consequences. Let's say, for example, let's suppose that Mr. Nava had died. Does the probate commissioner get to look behind the transfer and say, well, Mr. Nava's estate is going to acquire this house? No. Does he go into bankruptcy? Does the bankruptcy trustee come in and take the house away from Victoria? I think those are two different things. In the bankruptcy, they possibly could because it could be considered a hidden asset. In the fact of his death, probably not. But those are two different ways of looking at it. In the ancillary proceeding, she has to prove that she has a superior right, title, and interest, not just I have this piece of paper that says it's mine. Because, interestingly, on the one house, she doesn't just have one piece of paper saying it's hers. She has two. If, in fact, she was a bona fide purchaser for value, and the house, especially the house on 414, the one that she wasn't actually residing in, she has not just one, but two warranty deeds signed by Frank Nava, one that he gave her April 11th of 1996. But if you look at the excerpts of record, she's also got one right behind it dated January 20th of 1998. She's already got title to this house. Why does she need another warranty deed that's just about identical? There's no changes in it. Doesn't that suggest, and it suggested to the court, obviously, that this wasn't truthful. The other interesting issue, if you look at the time frame. What's the evidence of legal title here? She has a piece of paper that's been recorded with the clerk and recorder's office that says, I, Frank Nava, give you, Victoria Nava, this house. And it was duly recorded. It was. It was duly recorded. There were two different duly recorded deeds. He gave it to her in 1996, and then he gave it to her in 1998. But he didn't have to give back to her. Just looking at it from that particular standpoint, doesn't that constitute, under State property law, real property law, that she is the legal owner of the property? It can. But that's not the only issue that you look at. I mean, you look at who owns it under State law. But then you have to look at the federal statutes. There's an A and B section. And the court found she didn't meet either of those two A or B sections. You're talking about 853 N6. Yes. And he found her, number one, not to be a bona fide purchaser. And that's supported by the record. I mean, she has two separate warranty deeds on the property at 414. And if you look at the residence that she actually resided in, which she didn't live in when she got it, I mean, it's clear from the record that she was living somewhere else when she turned 18 and he gave her this property on the same day he gave her the other property. But if you look at the timing. There's no issue with respect to the time of that. That was pre-commission of this. No. It was during the commission of the offense. The offense in the indictment alleges and in the jury instructions that these things occurred before the year 2000. So it would be in the 1999s and previous. And if you look at the. I thought she was given these deeds prior to the conduct for which her father was convicted. No. She was given the deed April 11th of 1996. And if you look at the jury instructions, the jury had to find that this property was used or facilitated for drug trafficking before July 11th of 1999 or October 6th of 1999. And the question isn't did she get a legal piece of paper that says this house is yours. The court was looking at everything as they're required to do under federal law. And if you look at the place that she lived in, here's the interesting chain of events. She doesn't live there right away when they give it to her. She moves in at some later point. Then on November 20th of 2000, her father is indicted. At that point, this is a woman whose husband is in prison. It's clear from the record or live-in boyfriend, whatever you want to call him. She has had and does not have any legitimate employment. But the taxes are being paid. She never has had a mortgage on this property, never has made improvements on this property. Okay. So dad gets indicted November of 2000. In January of 2001, the court, sua sponte, from the record, raises an issue saying, I think your lawyer has a conflict of interest. And then on February 14th, the court orders the lawyer to be taken off the case for this conflict of interest. Then on April 4th, she makes an application for a $33,000 mortgage. First time ever in the history of this property that anybody needed anything about four and a half weeks after the one lawyer is off and Victor Nava has to find a new lawyer. Well, on April 4th, she owns the property herself. It is in her name according to the title. She makes application with her husband, Joseph Reyna. And then there's another application April 16th because she's not employed. She has no income. Reyna's income is the only thing that's being counted towards the payments. The April 4th mortgage application is made in person. The April 16th application is made over the phone. And then on April 19th, she deeds the property to them together because somebody's obviously said to her, you don't have any way to pay this back. You need to have the property in his name as well. So then there's a final application on May 3rd. They get the loan and get the mortgage shortly after that. And then on April 23rd, there's a new lawyer in place, a privately retained lawyer in place within less than a week of when she gets the mortgage proceeds and has said that her mortgage is for the purposes of refinancing. And they give the new lawyer, I believe from the transcript, $28,000, and the other $5,000 goes to the fees for the property. I don't think there's any question that she was obviously close to her father and that she's closely related to this. But it seems to me that she has demonstrated a superior title. And there are sort of two things that the government can do. Either you can go under a civil forfeiture statute and find that the property was used for drugs, in which case the chain of title is irrelevant to that, or you can charge her, as it appears that both she and perhaps her husband were involved in this ring, and then do your criminal forfeiture against her as an indictment. Those are two other options that the government, good options, it seems to me that the government has here. But they're not good options for the reason that the court found, and it's supported in whole by this record, that she did not have a superior interest. There is no case law that says having a piece of paper title in the State of Montana is a superior interest to all the other evidence. To not having title? Exactly. Really? Yes. That strikes me as such black letter law that it would be surprising if there were any case that said that. Well, she comes forward and she says, I have this piece of paper that says I own this house, and in this other house I own this house twice. And there was evidence that the court properly considered from the criminal case, according to the statute, of other people who said, no, that was Victor's house. I was there. He told me it was his house. There was evidence in the record that she told the probation officer that the court said that, actually. There was evidence in the record that he, in fact, paid all the taxes because she had no money and was not employed. I have a hard time understanding how this can affect title ownership as a matter of Montana real property law. But see, this is where we're mixing apples and oranges. She had a piece of paper that gave her title to the property. Well, it's an important piece of paper. It is an important piece of paper if there is some real consideration given for it. And that was one of the findings that the court made was you were not a bona fide purchaser for value. It was basically a sham. And once you ---- But I don't understand how that affects title. I can understand how games can be played. Okay. But I don't understand how that affects title. Is the question title or is the question interest in the property? Exactly. Okay. The statute specifically says that she has a legal right, title, or interest in the property, and it renders ---- Title is right in that statute. Exactly. And the court may have found that she had a paper piece of title, but that, in fact, did not give her a superior right to the property. Ms. Hurd, the statute also says that the interest vested in the petitioner rather than the defendant or was superior at the time of the commission of the acts which give rise to the forfeiture of the property. Right. But the indictment only goes back to 1997. Isn't that correct? No. The indictment in this case was one of those longer period of time indictments. It was over a period of years. But I thought that the indictment ---- did the indictment come down in 1997? No. The indictment actually was handed down in November of 2000. Well, it only covered acts back to 1997. She acquired the property in 1996. It did, but it was over that period of time. She says she acquired the property in 1996, and the court clearly found they did not believe her. But what's the date on the deed? What's the date on the title? The date on the ---- I guess which one? There are two on the one property. Tell us what are the dates. April 11th of 1996 and January 20th of 1998. Okay. Under Montana law. What time was it recorded in the Montana books? Those same days. Okay. 1996. She acquires whatever title Frank had as of 1996, because she's got a warranty deed. That's correct. And we have no reason to dispute the title official who testifies that Frank had lawful title. Well, I think what she testified to was that the chain of title ---- From the grandmother to Frank to Victoria. Exactly. Counsel, we've taken you way over time. Thank you. Mr. Sands, you have some reserve time. I just have a couple points, Your Honor. The question is ---- On this question of the crime, is it ---- connect that up with the 96th date. Is it clear that the crime occurred after 96 or not? Crime for which he was convicted. I believe that they were after 1997. I was not involved in this case in any manner, shape or form until Victoria ---- I mean, that's an issue, isn't it? I know this indictment came down ---- The title was transferred after the commission of the crime, then she's out. There has been no suggestion at any time during any of these proceedings that any of these crime, that this crime occurred prior to 1996. This question, your question to me is the first time I have heard that suggestion made that maybe some of these crimes occurred prior to. I had raised that issue in my brief. The indictment actually charges on or about June 11th, 1997 or before. Okay. Was there anything in the trial that suggested that it was before 97? You mean Victor Novice trial? I was not in attendance at that trial. Take your time. Go ahead. My point here is Ms. Hurd said that she was not a purchaser for value. I think the purchaser for value concept means, implies that what you're talking about is purchasing for value from the criminal defendant. And, of course, she got the property from her cousin, from her grandmother through her cousin. So she would not, never be a purchaser for value from the criminal defendant. The statute also allows for forfeiture, but only forfeiture of property owned by a criminal defendant or property acquired from a criminal defendant. And that is clearly not the case in the, here. That's all I have. Thank you. Counsel, the case just argued will be submitted for decision. And we will hear argument in the United States v. Yates. Thank you.
judges: O'scannlain, Rymer, Bybee